Galen **SCHRAG, Merlin Kaufman, Michael Maloney, Dale McCurry, A.J. McCurry, Robert McCurry, Odel McCurry, Cecil McCurry, James Meier, William G. Schwartz, and John R. Nickelson, individually, and in his capacity as Administrator of the Estate of Neola Nickelson, Plaintiffs,**

v.

Ted **DINGES Jr., Gary Dinges, Mark Youngers, Charles Brooks, Jay Ewing, Fred Shaffer, Robert "Bob" Simpson, Bonaventure A. Kreutzer, Jr., Denis Dieker, Paganica, Inc., Dinges International, Inc., and Ag–Marketing Commodities, Inc., Defendants.**

**Civ. A. No. 88–1373–T.**

United States District Court, D. Kansas.

Jan. 7, 1992.

Michael E. Baker, Najim & Baker, Wichita, Kan., James C. Dodd, Craig Dodd & Associates, Enid, Okl., for plaintiffs.

Thomas D. Kitch, David G. Seely, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendant Mark (NMI) Youngers.

Dan W. Forker, Jr., Reynolds, Peirce, Forker, Suter & Rose, Hutchinson, Kan., for defendant Charles (NMI) Brooks.

J. Stanley Hill, Branine, Chalfant & Hill, Hutchinson, Kan., Martin W. Bauer, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for defendant Jay (NMI) Ewing.

David J. Morgan, Robert J. Roth, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for defendant Fred (NMI) Shaffer.

Charles (NMI) Livingston, pro se.

Thomas L. Theis, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, Kan., William L. Mitchell, Mitchell & Henry, Hutchinson, Kan., for defendant Robert (NMI) Simpson.

Albert L. Kamas, Render, Kamas & Hammond, Wichita, Kan., for defendant Bonaventure A. Kreutzer, Jr.

Albert L. Kamas, Render, Kamas & Hammond, Joseph H. Cassell, Wichita, Kan., for defendant Denis (NMI) Dieker.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This is an action based on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and common law fraud. Defendants Dieker, Kreutzer and Youngers bring before this court motions to dismiss, challenging the sufficiency of the plaintiffs' claim, the particularity of the pleading, the court's subject-matter jurisdiction, and the constitutionality of the RICO statute.

The plaintiffs allege four counts of RICO violations and one count of common law fraud. The allegations involve the defendants' alleged schemes to (1) fraudulently bilk investors of their capital investment in a bogus commodities investment scheme; (2) fraudulently induce the plaintiffs to obtain loans in their names but for the defendants' use and benefit; (3) obtain fraudulent and illegal loans in the defendant Dinges' name, using the plaintiffs' property as collateral without their knowledge or consent; (4) fraudulently avoid the payment of debt by executing bogus promissory notes; and (5) fraudulently reduce the debt by exchanging the debt for worthless title to real property that the defendants did not own or that had previously been pledged as security by the defendants. (Doc. 353). The plaintiffs seek treble damages, plus interest, for the RICO violations outlined in Counts One through Four in an amount exceeding $4,500,000; and punitive damages in the amount of $15,000,000 with respect to Counts One through Five. The plaintiffs also seek an award of costs, including reasonable attorney's fees.

Jurisdiction is based on 18 U.S.C. § 1964, and the court's pendent jurisdiction.

## I. PLAINTIFFS' ALLEGATIONS

In their 105–page complaint, the plaintiffs allege numerous fraudulent schemes perpetrated by one or more of the named defendants. From the convoluted set of

facts in the plaintiffs' complaint, the court will briefly summarize only those allegations pertinent to the disposition of the motions presented to the court.

Count One of the complaint involves the Paganica Supper Club scheme. Merlin Kaufman, one of the plaintiffs in this case, owned a section of land that he was developing into a large residential community, which included a country club and golf course. Defendant G. Dinges, through his company called Paganica, was responsible for managing the development of streets, sewer and water, and marketing the residential lots in Kaufman's development. Kaufman and his partner, Sizemore, owned all the property within the development except for the residential lots sold to individual purchasers and the golf course area, which belonged to Paganica.

Within the country club complex were a pro shop and supper club, both operated by plaintiffs Schwartz and Meier under a lease agreement with Paganica. Paganica later entered into a contract allowing Schwartz and Meier to take over operations of the entire country club complex with an option to purchase the complex and golf course for $1 million. Schwartz and Meier received an express promise that the property would not be further encumbered.

As the developer, Paganica possessed exclusive authority and responsibility for the development of the property. In 1980, the EPA halted the sale of lots and froze the development due to substandard well and sewer systems. Paganica was directed to repurchase all previously-sold lots for the original price plus interest. Paganica installed new water and sewer systems through the issuance of municipal bonds, and hoped that the lots would find new purchasers. The lots, however, remained virtually unsold by 1982. The EPA repurchase requirement and the lack of lot sales brought Paganica to the verge of bankruptcy.

Hoping to retire Paganica's debt and return the corporation to profitability, G. Dinges and Ewing devised a plan to start a new corporation, refinance the Paganica debt, transfer Paganica's assets to the new corporation and retire the Paganica refinancing debt through the sale of stock issued by the new corporation. Under the alleged scheme, the new corporate entity would hold and manage commercial real estate nationwide; property owners would own capital stock in this corporation in return for transferring their real estate to the corporation. The properties transferred to this corporation, however, must be subject to low debt leverage or no debt at all, and must have a positive cash flow after debt service. From this concept of exchanging capital stock for real estate, Rexmoor Properties, Inc. ("Rexmoor") was born.

Seeing Rexmoor as his financial savior, G. Dinges wished to participate as a principal in this new revolutionary business enterprise. He also wanted Paganica to exchange its property assets for stock in Rexmoor. However, Paganica and G. Dinges were deeply in debt, and had no "debt free" property to transfer to Rexmoor or money to raise the $1 million initial capital investment required to get Rexmoor off the ground.

Defendant Mark Youngers was Chief Financial Officer at Valley Federal Savings & Loan. Youngers was a major stockholder in the nearly-bankrupt Paganica. He also owned stock in Americo, another insolvent company run by G. Dinges. In November 1981, G. Dinges secretly agreed to trade Youngers' worthless stocks in Americo and Paganica for valuable capital stock in Rexmoor. In addition to this trade, Youngers would also receive 50,000 Rexmoor shares at no cost. Youngers, who stood to reap enormous profit from the success of Rexmoor, agreed to help G. Dinges obtain loans from Valley Federal for the purpose of making Rexmoor a reality.

G. Dinges, already deeply in debt from his Paganica ventures, approached Valley Federal in November 1981 for a loan to enable Rexmoor to make a public offering of its stock. When the Board of Directors of Valley Federal refused to grant the loan, the president of Valley Federal, defendant Shaffer—who personally stood to profit from the Rexmoor venture—entered into

an agreement with Ellinwood Bank, whose president, defendant Simpson, also had a personal stake in Rexmoor. Under that agreement, Ellinwood Bank would loan Paganica $500,000 to be secured by a $500,000 irrevocable letter of credit issued by Valley Federal. As security for Valley Federal's letter of credit, G. Dinges encumbered the property that was subject to the Schwartz–Meier exclusive option, in violation of their previous contract. Youngers, as a board member of Paganica and bank officer at Valley Federal, is alleged to have known about the Schwartz–Meier option. Because Paganica had to transfer "debt free" property to Rexmoor in exchange for stocks, Youngers, Shaffer and a fellow bank officer named Brooks decided not to file the mortgage on the Schwartz–Meier property. Simpson, in turn, agreed that Ellinwood Bank would not call Valley Federal's letter of credit if Valley Federal would loan $1 million on an uncreditworthy real estate project known as Hidden Valley, thereby releasing Simpson from a loan guarantee in connection with the Hidden Valley project. Because of the Hidden Valley loan, Simpson later permitted the Valley Federal letter of credit to expire.

The $500,000 loan from Ellinwood Bank was insufficient for G. Dinges to refinance the Paganica debt and loan Rexmoor part of its required capital. Thus, Valley Federal—through Shaffer, Youngers and Brooks—made several additional major loans to G. Dinges and Paganica. To enable Paganica to qualify for loans of such magnitude, Shaffer, Youngers and Brooks intentionally misrepresented Paganica's financial condition. Specifically, the income and assets of Paganica Golf and Supper Club, which belonged to plaintiffs Schwartz and Meier, were misrepresented as Paganica's assets and income.

These fraudulent loans extended by Valley Federal were repaid in May 1984 by Boulevard Bank. Youngers allegedly forwarded correspondence and loan documents, which included the Schwartz–Meier mortgage, to co-defendant Denis Dieker, vice-president at Boulevard Bank, in an attempt to escape detection by the banking authorities.

Rexmoor never lived up to the expectations of its creators. By the middle of 1983, Shearson/American Express and Jessup & Lamont, respected national firms, withdrew as broker-manager for Rexmoor. In July 1983, Coldwell Bankers, the company that performed the appraisals on prospective Rexmoor properties, withdrew its approval to use its appraisals. In January 1984, the SEC refused to permit Rexmoor to go forward, and conducted another review of the entire offering. The Rexmoor registration statement was withdrawn from the SEC on February 3, 1984.

The plaintiffs allege that the defendants committed mail fraud on various specified occasions in using the United States Postal Service to deliver correspondence, loan documents, mortgages, and other materials in connection with the fraudulent Paganica Supper Club scheme.

In Count II, the Kaufman Real Estate scheme, the plaintiffs allege that the defendants, in September 1982, fraudulently mortgaged Kaufman's property, without his knowledge or consent, to The First National Bank & Trust Co. of Oklahoma City as security for a $3.2 million loan commitment. The First National loan was necessary to take Rexmoor public. The defendants Youngers, Brooks, Shaffer, G. Dinges and Ewing allegedly knew that the mortgaged property belonged to Kaufman, not G. Dinges or Paganica. Although the mortgage was executed in September 1982, it was not recorded until February 1984. With full knowledge of the fraudulent encumbrance on Kaufman's property, the defendants used the mail service to deliver the fraudulent mortgage, and to market two securities offerings containing misrepresentations as to Paganica's income and assets.

Count III alleges that, in November 1982, T. Dinges convinced plaintiff Galen Schrag to invest in Ag–Marketing's Managed Partnership Accounts ("MPA"), which T. Dinges claimed to be a foolproof investment. Although Schrag did not have the money to invest, he was assured that Valley Federal would loan him the money.

Schrag gave Valley Federal a security interest in his crops and milking equipment in exchange for a loan approximating $356,000. The quarterly payments on the loan were in excess of $12,000. T. Dinges and Brooks assured Schrag that Ag–Marketing would make all quarterly payments. Schrag received only $156,000 of the loan proceeds; the remainder went to Ag–Marketing, T. Dinges and G. Dinges.

Defendant Youngers had invested in Ag–Marketing, and thus had a stake in assuring the financial integrity of Ag–Marketing. Youngers, in concert with Shaffer and Brooks, caused Valley Federal to make the Schrag loan, knowing that it would be used to sustain the effort to take Rexmoor public and to financially benefit those individuals instrumental to the success of Rexmoor.

T. Dinges also defrauded the McCurry brothers into investing $75,000 in Ag–Marketing, promising them that their investment would be protected by marketable securities in an escrow account. Motivated by his financial interest in Ag–Marketing and Rexmoor, Youngers allegedly misrepresented that Valley Federal would serve as an escrow agent for the above transaction, and signed a receipt acknowledging receipt of marketable securities for the escrow account. Youngers signed the receipt and mailed it to one of the McCurry brothers in December 1982. No such escrow account was ever created, however; nor were any marketable securities delivered to Youngers. The plaintiffs subsequently lost their investments—after T. Dinges had "churned" their accounts.

Counts IV and V are based on the alleged fraud perpetrated by defendants G. Dinges, Dieker and Kreutzer on plaintiffs Nickelson and the estate of his wife ("the Nickelsons"). The Nickelsons had sold their fertilizer business to ConAgra for $400,000, of which $200,000 would be amortized at the rate of $4,550 per month. In October 1985, G. Dinges persuaded Nickelson to loan him $87,500 to pay closing costs for the sale of the Paganica development, promising Nickelson total repayment plus a 20% profit from the proceeds of the sale.

In fact, the Paganica sale had been closed 11 months earlier, after Rexmoor collapsed. G. Dinges needed the money to repay his debts at Boulevard Bank.

Realizing that Nickelson did not have the money on hand to extend such a loan, G. Dinges informed Nickelson that Boulevard Bank would make a $87,000 loan to Nickelson, which he could then hand over to G. Dinges. To secure the Boulevard Bank loan, Nickelson had to pledge his one-half interest in the monthly ConAgra checks. Because the ConAgra checks were issued in his wife's name, John Nickelson had to assign the entire check, worth $175,000, to Boulevard Bank under an agreement that Boulevard Bank would then return $2,275 per month to his wife. Defendants Dieker and Kreutzer, officers at Boulevard Bank, allegedly promised Nickelson that only $87,000 of the $175,000 ConAgra line of credit would be loaned to G. Dinges for the closing costs of Paganica Development, and that Nickelson's wife would receive her monthly share of the checks. However, Dieker and Kreutzer disbursed the entire ConAgra line of credit to G. Dinges, which went towards repayment of his prior debts and personal use. Nickelson's wife never received her monthly payments from Boulevard Bank. Nickelson lost his investment and his share of the ConAgra contract.

## II. DISCUSSION

In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept as true all material allegations in the complaint, and must construe the complaint in favor of the complaining party. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Swanson v. Bixler,* 750 F.2d 810, 813 (10th Cir.1984). The court may not dismiss a cause of action for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts to support the theory of recovery that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1148 (10th Cir.1989).

## 1. Denis Dieker's Motions

Denis Dieker has presented the court with several motions to dismiss. He joins co-defendant Bonaventure Kreutzer in moving to dismiss Count V for lack of subject-matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1). (Doc. 454). In their joint motions, Dieker and Kreutzer also present a Fed.R.Civ.P. 12(b)(6) motion to dismiss Count V on the grounds that the claim is barred by the statute of limitations. (Doc. 396).

### A. Subject-matter Jurisdiction for Pendent Claim

■ The court first addresses the issue of subject-matter jurisdiction raised by Dieker and Kreutzer with respect to Count V. Count V involves a pendent state claim for common law fraud, which was joined with the federal RICO claims in Counts One through Four. The defendants Dieker and Kreutzer, it is argued, are pendent parties, as are the new plaintiffs, John Nickelson and the estate of Neola Nickelson. The defendants claim that it is improper to join pendent party plaintiffs to assert a state law claim against pendent party defendants without independent federal jurisdiction already existing.

■ A federal court has jurisdiction over pendent state claims when the state claims share a "common nucleus of operative facts" with the federal claims. *United Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The decision to exercise jurisdiction over pendent state claims is a matter of judicial discretion, involving considerations of comity, judicial economy, convenience, and fairness to the litigants. *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988).

Count V of the present case is related to the RICO claim in Count IV, which the defendants do not challenge. In Count IV, the Nickelsons allege RICO violations against G. Dinges, Dieker and Kreutzer for their alleged roles in the ConAgra scheme. Count V involves the same factual allega-

tions and parties, but its legal theory is predicated on common law fraud instead of RICO. As such, there is a common nucleus of operative facts linking the two counts. Because the defendants do not at this time contest the federal RICO claim in Count IV,[1] federal jurisdiction also extends over the state fraud claim involving the same transactions and parties. The defendants' motion to dismiss Count V for lack of subject matter jurisdiction must, therefore, fail.

### B. Statute of Limitations

■ Under Kansas law, a cause of action based on fraud accrues when "the fraud is discovered." K.S.A. § 60–513(a)(3). The alleged fraud is deemed "discovered," thereby triggering the statute of limitations, when "the act giving rise to the cause of action causes substantial injury, or, if the fact of injury is not reasonably ascertainable until sometime after the initial act, then ... [when] the fact of injury becomes reasonably ascertainable to the injured party." *Id.* at § 60–513(b). Thus, a plaintiff is deemed to have discovered the fraud when he knew or, with reasonable diligence, should have known of the acts or conduct giving rise to the injury. *Augusta State Bank & Trust v. Broomfield*, 231 Kan. 52, 643 P.2d 100 (1982).

Defendants Dieker and Kreutzer contend that Nickelson's common law cause of action based on fraud is time-barred under Kan.Stat.Ann. § 60–513(a)(3), which establishes a two-year statute of limitations for fraud claims. Dieker and Kreutzer were added as party defendants in the Third Amended Complaint, which the plaintiffs filed on April 11, 1990. Nickelson's fraud claim, the defendants assert, accrued in November 1985 when he failed to receive the checks promised by G. Dinges or, at the latest, February 1987 when Boulevard Bank, which was responsible for issuing those checks to the Nickelsons, was declared insolvent. On that basis, therefore, the defendants contend that the fraud

---

1. Defendants, at this time, have not presented a 12(b)(6) challenge to the sufficiency of the RICO claim in Count IV. The court, therefore, does not address the issue of whether the plaintiffs have successfully stated a RICO claim in Count IV.

claim fails to satisfy the two-year limitation period.

The court notes at the outset that a limitation argument is seldom appropriate at the pre-discovery stage where the accrual of the cause of action hinges upon a party's actual or constructive knowledge of a fraudulent act. As the majority of the circuits have acknowledged, "the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question for the jury." *Maughan v. SW Servicing, Inc.,* 758 F.2d 1381, 1387 (10th Cir.1985); *see also Ramsey v. Culpepper,* 738 F.2d 1092, 1097 (10th Cir. 1984) (affirming trial court's decision to submit to the jury the question of when plaintiff discovered the fraud).

Even if due diligence in discovering the fraud is a question for the court, *see Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687 (10th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981), the facts of the present case do not lend themselves to a pre-discovery determination as a matter of law. Viewing the plaintiff's version of the facts as true, as the court must do in a Rule 12(b)(6) motion, the alleged fraud by Dieker and Kreutzer was not discovered until May 10, 1988, when Dieker was deposed in a separate case. Although the Nickelsons may have had reason to suspect that G. Dinges had defrauded them when the promised checks did not arrive, there was no apparent reason at that time for the plaintiffs to know about the involvement of Dieker and Kreutzer in the fraudulent scheme. Without the benefit of discovery, this court cannot hold as a matter of law that the Nickelsons knew or should have known by February 1987 about the defendants' involvement with G. Dinges in the fraudulent scheme. The motion to dismiss is, therefore, denied.

### 2. Mark Youngers' Motions

Defendant Mark Youngers challenges the sufficiency of the plaintiff's entire complaint, claiming that the pleading fails to meet the particularity requirement of Fed. R.Civ.P. 9(b), and that the pleading fails to state a claim against him upon which relief can be granted. (Doc. 399). Youngers also filed a separate motion challenging the constitutionality of the RICO statute on its face and as applied to himself. (Doc. 468).

### A. Rule 9(b) Particularity

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) applies to fraud claims in civil RICO complaints. *See Haroco, Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 405 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Rule 9(b)'s particularity requirement, however, is not absolute or limitless; a plaintiff need not go so far as to give the defendant a "pretrial memorandum containing all the evidentiary support for plaintiff's case." *Pellman v. Cinerama, Inc.,* 503 F.Supp. 107, 111 (S.D.N.Y.1980).

Rule 9(b) must be read in conjunction with Fed.R.Civ.P. 8(a), which requires "a short and plain statement of the claim," and with Fed.R.Civ.P. 8(e), calling for "simple, concise, and direct averments in pleadings." *Michaels Building Co. v. Ameritrust Co., N.A.,* 848 F.2d 674 (6th Cir.1988). The purpose behind Rule 9(b)'s particularity requirement is to ensure that a defendant receives fair notice of the substance of a plaintiff's claim so as to prepare a responsive pleading. To satisfy Rule 9(b), then, a pleader need only set forth "a brief sketch of how the fraudulent scheme operated, when and where it occurred, and the participants." *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 749 F.Supp. 869 (N.D.Ill.1990) (quoting *Tomera v. Galt,* 511 F.2d 504, 509 (7th Cir.1975)); *see also DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) (plaintiff must specify the time, place, speaker and content of the alleged misrepresentation or fraudulent practice).

The court finds that the plaintiffs have satisfied the particularity requirement of Rule 9(b). The Third Amended Complaint outlines the "how, what, where and who" in sufficient detail to provide adequate notice to the defendants of the "nature and essential elements of the alleged fraud,"

and the role that each defendant allegedly played in the scheme. *See Adair v. Hunt Int'l Resources Corp.*, 526 F.Supp. 736, 744–45 (N.D.Ill.1981). In other words, "the defendants are not left guessing as to the outlines of the fraud, its purposes, or the critical facts." *Id.* The court, therefore, denies Younger's motion to dismiss for failure to comply with Rule 9(b).

### B. Rule 12(b)(6) Motion for Failure to State a Claim

■ Mark Youngers presents a 12(b)(6) motion, contending that the plaintiffs failed to state a claim in Counts I through III for which relief can be granted. Specifically, Youngers assert that "[n]o facts are alleged that would suggest that any alleged mailings by Youngers caused or contributed in any way to plaintiffs' claimed injuries." (Doc. 399, p. 2).

The plaintiffs allege that Youngers violated subsections (b) and (c) of 18 U.S.C. § 1962. Subsection (b) prohibits a person from acquiring or maintaining, through a "pattern of racketeering activity," any interest in or control of an enterprise engaged in interstate commerce. Subsection (c), on the other hand, makes it unlawful for a person employed by or associated with an interstate-commerce enterprise to participate in such enterprise's affairs through a pattern of racketeering activity.

Count I of the complaint includes a description of Youngers' alleged role in the Paganica Supper Club scheme. According to the complaint, Youngers assisted G. Dinges in obtaining a loan from Valley Federal by using his position as Chief Financial Officer for Valley Federal. He handled matters pertaining to security for the loan; provided assurance to Ellinwood Bank that the irrevocable letter of credit continued in effect; ensured that G. Dinges obtained a $97,500 loan from Financial Investments—a subsidiary of Valley Federal—and that he (Youngers) would share in part of the proceeds. He is also alleged to have coordinated the issuance and reissuance of Rexmoor stock to Financial Investments; coordinated further advances under the original loan commitments to Paganica to retire its other debts; and provided the documents necessary for the Boulevard Bank loan that was used to retire all Valley Federal loans to Paganica.

Count I also alleges that Youngers, together with the other defendants, committed mail fraud on various specified occasions, constituting the predicate acts of the RICO charge. Each instance of mail fraud is a "racketeering activity," the plaintiffs contend. The plaintiffs also allege that the multiple instances of racketeering activity constitute a "pattern of racketeering activity" as defined in § 1961(5) because each act was part of a common and continuous scheme, perpetrated for similar purposes. Count I goes on to allege that Youngers, in concert with the other defendants, maintained an interest in and control of Paganica, an enterprise engaged in interstate commerce, through the above pattern of racketeering activity in violation of § 1962(b). In addition, Youngers allegedly violated § 1962(c) by participating in the conduct of the affairs of Valley Federal, Financial Investments and Paganica through the above pattern of racketeering activity.

In Count II, the plaintiffs assert that Youngers participated in the Kaufman real estate mortgage scheme by approving the use of collateral to obtain a $2 million loan commitment from First National and to secure the $1.2 million loan to Rexmoor; by approving the loan itself in his capacity as a member of the Paganica Board of Directors; and by helping Paganica obtain funds to meet its debt service to Valley Federal. As in Count I, Count II provides a detailed listing of the instances of mail fraud, which constitute a pattern of racketeering activity. Count II alleges that Youngers maintained an interest in or control of Paganica and participated in its affairs through a pattern of racketeering activity in violation of §§ 1962(b) and 1962(c).

Youngers' involvement in Count III took the form of signing an escrow receipt representing to the McCurrys that Valley Federal had in fact received marketable securities under the terms of the escrow agreement designed to secure the McCurrys' investment in Ag–Marketing MPAs; and per-

mitting co-defendant Brooks to make the Schrag loan. Again, Youngers is alleged to have violated § 1962(b) based on his participation in the affairs of Valley Federal through a pattern of mail fraud, the racketeering activity.

In each of the above three counts, the plaintiffs allege that Youngers' involvement in the fraudulent schemes caused the plaintiffs economic injury. The court finds that the plaintiffs have sufficiently stated all the essential elements of a RICO claim at this pre-discovery stage. In raising a 12(b)(6) motion, defendant Youngers faces a heavy burden of showing that the plaintiffs will absolutely be unable to prove their cause of action. *See Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02. Defendant has not persuaded the court that such is the case here. Mindful of the defendant's heavy burden, the court dismisses defendant Youngers' motion to dismiss for failure to state a claim. Any deficiencies in the plaintiffs' case should more appropriately be brought up by summary judgment motions after the plaintiffs have had an opportunity to substantiate their allegations through discovery.

### C. Constitutionality of RICO's Pattern Requirement

■■■ Youngers contends that RICO is unconstitutionally vague on its face and as applied to him, in violation of the Fifth Amendment due process clause. Youngers specifically argues that RICO's requirement of a "pattern of racketeering activity" provides no guidance or notice to him regarding what conduct is prohibited by the statute.

"Racketeering activity," as previously stated, includes mail fraud and wire fraud, offenses which Youngers is alleged to have committed. A "pattern" of racketeering activity, as defined in § 1961(5), consists of at least two predicate acts of racketeering not exceeding a span of ten years intervening between the two most recent acts. The "pattern" requirement in RICO "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern."

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

In *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court reiterated the well-established concept that racketeering acts form a "pattern" in RICO where they exhibit "continuity plus relationship." *Id.* at 239, 109 S.Ct. at 2900. The "relationship" requirement is satisfied when the racketeering acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901 (citing *Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14). With respect to the "continuity" requirement, the Supreme Court stated that the predicate acts must amount to, or pose a threat of, continuing racketeering activity. *Id.* According to the Supreme Court, continuity "is both a closed- and open-ended concept, referring to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* A RICO plaintiff "may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* Predicates extending over merely a few weeks or months, on the other hand, may satisfy the continuity element if there is a threat of repetition in the future. This latter concept of continuity, which occurs over an "open period," is established by showing that the predicate acts are a "regular way of conducting [the enterprise's] ongoing business." To show continuity, then, what a plaintiff has to prove is either "continuity of racketeering activity, or its threat, *simpliciter.*" *Id.*

In his concurrence in *H.J., Inc.,* Justice Scalia raised the specter of constitutional infirmity in RICO's pattern requirement. Pointing to the "kaleidoscope of Circuit positions" on the definition of "pattern," Justice Scalia admitted, "[T]he word 'pattern' ... was meant to import some requirement beyond the mere existence of multiple predicate acts.... But what that something is, is beyond me." Justice Scalia lamented over the Court's inability to

provide meaningful guidance concerning the application of RICO. "That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when [a constitutional] challenge is presented," he concludes.

Seizing upon Justice Scalia's invitation to challenge the constitutionality of RICO's pattern requirement, defendant Youngers contends that RICO is unconstitutionally vague as written and as applied to him. Youngers also relies on *Firestone v. Galbreath*, 747 F.Supp. 1556, 1581 (S.D.Ohio 1990), which struck down RICO as unconstitutionally vague as applied to "a dispute between family members concerning whether certain property should have remained in a relative's estate." [2]

A statute is facially vague when it "either forbids or requires the doing of an act in terms so vague that [people] of ordinary intelligence must necessarily guess as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). A statute must provide reasonably precise standards so that judges or juries are not left to decide arbitrarily what is prohibited and what is not in each particular case. *Giaccio v. Penn*, 382 U.S. 399, 403, 86 S.Ct. 518, 521, 15 L.Ed.2d 447 (1966). Vagueness challenges, however, are greeted with a strong presumption in favor of the statute's validity. *United States v. National Dairy Prods. Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963).

As to his facial challenge, defendant Youngers has overlooked the principle that a defendant has no standing to attack a statute as unconstitutional on its face unless First Amendment concerns are implicated. *E.g., United States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975); *New York v. Ferber*, 458 U.S. 747, 767–69, 102 S.Ct. 3348, 3359–61, 73 L.Ed.2d 1113 (1982). Because a statute generally may not be challenged on the ground that it may conceivably be vague in

certain hypothetical situations, vagueness challenges must ordinarily be examined only in light of the particular facts at hand. *E.g. Powell*, 423 U.S. at 92, 96 S.Ct. at 319. According to the Supreme Court in *Ferber*, 458 U.S. at 767, 102 S.Ct. at 3359, this rule against facial challenges "reflects the two cardinal principles of our constitutional order: the personal nature of constitutional rights, and prudential limitations on constitutional adjudication." The law recognizes an exception where First Amendment rights are involved, however, because of the chilling effect that vague laws may have on the exercise of constitutionally protected expression. *Id.* at 768, 102 S.Ct. at 3360–61. Nevertheless, this First Amendment overbreadth exception must be narrowly construed and applied "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

Youngers makes no claim that the RICO statute impinges upon his right of free expression. To claim that the alleged predicate acts of mail and wire fraud implicate freedom of expression would, indeed, require a strained interpretation of First Amendment rights. *See United States v. Eisenberg*, 773 F.Supp. 662 (D.N.J.1991) (rejected defendant's characterization that misrepresentations made in connection with bribery and scalping schemes constitute free expression). Because Youngers presents no First Amendment issue, his facial challenge to RICO is untenable. Youngers is left, therefore, with a constitutional challenge to RICO as applied to his particular set of facts.

For his vagueness challenge to succeed, then, Youngers must show that RICO's pattern requirement was so unclear that a person of ordinary intelligence in Youngers' position would not have had adequate notice that his actions amounted to a pattern of racketeering activity. *See, e.g., Abell v. Potomac Ins. Co. of Illinois*, 946 F.2d 1160 (5th Cir.1991). According to the plaintiffs, Youngers used the mails and

---

2. The court in *Firestone* also ruled, without any discussion of standing, that RICO is unconstitu- tionally vague as written. *Id.*

wires to execute several schemes to defraud the plaintiffs, including forwarding fraudulent mortgages, loan documents containing those fraudulent mortgages, stock certificates, and other materials relating to the alleged fraudulent schemes.

Youngers does not explain whether it is the "relatedness" component or the "continuity" element that has caused RICO's pattern requirement to be unconstitutionally vague as applied to his particular circumstance. Instead, Youngers merely complains that the plaintiffs' pleading is so deficient that "it is difficult, if not impossible, for [him] to explain more fully how the statute is vague as applied in the present case." To the extent that Youngers is resurrecting his 9(b) motion to dismiss for lack of particularity, his arguments are rejected; the court has already concluded that the pleading satisfies the mandates of Rule 9(b).

If Youngers is challenging the relatedness and continuity of the alleged predicate acts, the court also rejects his assertion. All the predicate acts attributed to the defendant share similar purposes, results, participants, victims, or methods of commission. The predicate acts allegedly occurred over a period of several years and do not appear wholly isolated or sporadic, satisfying closed period continuity. Moreover, Youngers was allegedly involved in multiple fraudulent schemes, a "highly relevant" factor in assessing continuity. *See H.J., Inc.*, 492 U.S. at 240, 109 S.Ct. at 2901.

The pattern requirement under Youngers' alleged set of facts is, thus, not so vague that an ordinary person in his shoes would not have known that his actions amounted to a pattern of racketeering activity. Because the court has to give the plaintiffs every benefit of the doubt in a Rule 12(b)(6) motion, the court is not prepared to say as a matter of law at this prediscovery stage that Youngers' activities were so lacking in relationship and continuity that an ordinary person would not have had adequate notice that those activities violated RICO's pattern requirement.[3]

It may be that Youngers contends that the *nature* of this case makes the application of RICO unconstitutionally vague. The *Firestone* court, which held that RICO was unconstitutionally vague as applied to a family dispute over a decedent's property, intimated that the average person would not have had adequate notice that such a situation fell within RICO's strictures. 747 F.Supp. at 1581. Youngers' situation, however—involving multiple schemes of fraud in the commercial setting by an officer of a financial institution—is distinguishable from the family probate dispute in *Firestone*. While the present case may not involve the classic scenario of mobster activity, it is sufficiently close to the typical situations for which the statute is routinely used. It should come as no surprise, then, that RICO lurked in the shadows of those activities undertaken by Youngers.

Furthermore, although the Tenth Circuit has not spoken on this issue, the federal courts that have considered vagueness challenges to RICO as applied to particular sets of facts have unanimously upheld the statute, with the exception of *Firestone*. *See, e.g., Abell*, 946 F.2d at 1165–67; *United States v. Glecier*, 923 F.2d 496, 497 n. 1 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *United States v. Coiro*, 922 F.2d 1008, 1016–17 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *United States v. Woods*, 915 F.2d 854, 862–64 (3d Cir.1990), *cert. denied sub nom., Hartman v. United States*, —— U.S. ——, 111 S.Ct. 1413, 113 L.Ed.2d 466 (1991); *United States v. Angiulo*, 897 F.2d 1169, 1178–80 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United*

---

**3.** The court, however, would entertain a summary judgment motion if discovery fails to turn up any support for the plaintiffs' allegations. If, indeed, discovery reveals that Youngers' acts were sporadic and isolated, and not related and continuous as alleged, the better course would be to dismiss the case on summary judgment for failure to satisfy RICO's "pattern" requirement, rather than for constitutional vagueness. *But see Firestone*, 747 F.Supp. at 1581 (RICO held unconstitutionally vague because the alleged predicate acts were "isolated and sporadic").

*States v. Eisenberg,* 773 F.Supp. 662, 726–31 (D.N.J.1991); *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 749 F.Supp. 869, 874 (N.D.Ill.1990); *United States v. Paccione,* 738 F.Supp. 691, 694–99 (S.D.N.Y.1990).

For the reasons articulated above, therefore, Defendant Youngers' constitutional challenge to RICO is rejected.

IT IS BY THE COURT THEREFORE ORDERED that Defendants Dieker and Kreutzer's motions to dismiss (Docs. 396 & 454) are hereby denied.

IT IS BY THE COURT FURTHER ORDERED that Defendant Youngers' motions to dismiss (Docs. 399 & 468) are hereby denied.