**BCCI HOLDINGS (LUXEMBOURG), S.A., et al., Plaintiffs,**

v.

**Clark M. CLIFFORD, et al., Defendants.**

**Civil Action No. 94–1461(JHG).**

United States District Court, District of Columbia.

May 5, 1997.

---

8. See 5 Wright & Miller, *Federal Practice and* Procedure § 1281 (1990).

**472**

James Purnell Davenport, Jeffrey David Robinson, Stacy Allison Feuer, Baach, Robinson & Lewis, Michael Nussbaum, Ropes & Gray, Robert S. Whitman, U.S. Senate Office of Chief Counsel for Employment, Eric Leslie Lewis, Anne Katherine Toomey, Baach, Robinson & Lewis, Washington, DC, for plaintiffs.

William Horace Jeffress, Jr., Douglas Frank Curtis, Miller, Cassidy, Larroca & Lewin, L.L.P., Peter R. Kolker, Stephen Howard Glickman, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, LLP, Roger Eugene Warin, Antonia Beatrice Ianniello, Robert Charles Barber, Kenneth L. Miller, Steptoe & Johnson, L.L.P., Wallace Albert

Christensen, I, Ross, Dixon & Masback, L.L.P., Washington, DC, for defendants.

### MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This action stems from the collapse of the Bank of Credit and Commerce International ("BCCI") and has been brought by the Court Appointed Fiduciaries on behalf of the BCCI Group. Presently before the Court are the defendants' motions to dismiss. For the reasons stated below, the motions will be denied.

### I. Background

In a nine-count Complaint, the plaintiffs allege civil RICO, breach of fiduciary duty, negligence, unjust enrichment, common law fraud and conversion against Defendants Clark M. Clifford ("Clifford") and Robert A. Altman ("Altman"). They also charge breach of fiduciary duty, negligence, aiding and abetting, common law fraud and unjust enrichment against Defendant Baldwin B. Tuttle ("Tuttle") as well as a cause of action against the former partners of Clifford & Warnke based upon the firm's conflict of interest and negligent advice.[1] Complaint ¶ 1.

The plaintiffs assert further that the defendants were mired in irreconcilable conflicts of interest arising from their simultaneous representation of the BCCI Group, the First American companies (Credit and Commerce American Holdings, N.V. ("CCAH"), and Credit and Commerce American Investment, B.V. ("CCAI")), First American Corporation ("FAC"), First American Bankshares ("FAB") and others. Id. ¶¶ 2 & 34. According to the Complaint, "[a]t all relevant times, until banking regulators brought the BCCI Group under court-supervised control on July 5, 1991, the BCCI Group was adversely dominated by corrupt senior managers and directors, who, in conjunction with Defendants Clifford and Altman engaged in the harmful acts" stated in the Complaint. Id. ¶ 96.

### BCCI's acquisition of First American

The principal allegation stems from actions taken by the allegedly corrupt senior manag-

---

1. The former partners, collectively referred to as the "Clifford & Warnke partners" are John G. Calendar, Alfred W. Cortese, Jr., James C. Duff, David. I. Granger, Philip H. Hecht, John F. Kovin, J. (Griffin Lesher, Harold D. Murry, Jr., Robert P. Reznick, Thomas R.Spradlin, James T. Stovall, III, Paul C. Warnke, Larry L. Williams, and Bryan H. Yolles.) See Complaint ¶¶ 19–33.

ers and officers of BCCI and Clifford and Altman, based upon legal advice provided by its counsel, the law firm of Clifford & Warnke to acquire ownership fraudulently and maintain control illegally of First American Bank.[2] Agha Hasan Abedi ("Abedi"), who founded BCCI and served as its top corporate director until 1988, retained Defendants Clifford and Altman in late 1977 to assist in the acquisition of Financial General Bankshares[3] ("FGB") through the purchase of stock by nominees. Complaint ¶¶ 36 & 39–40. Abedi had long been interested in entry into the United States' banking market, but had been unsuccessful in his earlier attempts to acquire the Bank of Commerce, a New York subsidiary of FGB. *Id.* ¶ 39. Abedi planned to acquire FGB secretly by circumventing SEC disclosure regulations through the allocation of shares among nominee purchasers. Each nominee purchaser would acquire just under five percent in order to avo*id.* triggering disclosure and reporting requirements under U.S. law. *Id.* ¶ 40.

The plaintiffs contend that Defendants Clifford and Altman, supported by Defendant Tuttle's legal advice and regulatory filings, played a central role in the scheme. As reflected in a telex to Abedi from his principal assistant, Abdus Sami:

> In view of the possibility of this contest and also for presentation of the holding company application to the Fed our friend advised that we may retain Mr. Clifford as chief counsel, the preparatory functions being handled by Mr. Metzger's firm.
>
> Accordingly, I met Mr. Clark Clifford and explained to him our strategy and our goal. He was happy to know the details and blessed the acquisition. In the next few days we would start putting together material for a tender offer.

Complaint ¶ 40 (quoting telex of January 30, 1978).

The Complaint declares that during the course of the FGB takeover, Defendants Clifford, Altman and Tuttle acted in various capacities with inherent conflicts of interest, and they knowingly prepared and submitted numerous false filings with the SEC and state and federal bank regulators. *Id.* ¶¶ 41–42. Among other things, Clifford and Altman are said to have misrepresented the identity of the FGB stock purchasers as well as the economic interests underlying the purchases. Those alleged misrepresentations include the following:

1) On March 17, 1978, Clifford and Altman filed individual Schedules 13D with the SEC, which falsely stated, *inter alia,* that "none of the Stock Purchasers ... intend[ed] to act together with any other person with respect to shares of [FGB]," and that "no other person ha[d] an economic interest in the shares of [FGB] beneficially owned by them." *Id.* ¶ 43.

2) On September 15, 1978, Clifford and Altman filed an amendment to the original Schedule 13D, stating that "CCAH does not and will not own, directly or indirectly, any shares of the capital stock of [BCCI], and BCCI will have no interest in CCAH." *Id.* ¶ 44.

3) In early 1978, in response to the Federal Reserve's questions to Clifford and Altman, Defendant Altman "falsely stat[ed] that the BCCI Group was acting as the commercial banker and financial advisor for the Middle Eastern investors, and that 'while BCCI had been used to move funds for the investors into the U.S., it had not financed any of the FGB share purchases.'" *Id.* ¶ 45.

4) Altman filed a false application on October 19, 1978, which stated that the "cash required to make the tender offer would come from the investors' personal funds and possibly from personal borrowings from one or more financial institutions (which would be unaffiliated with BCCI or any of its affiliates)." *Id.* ¶¶ 46–47. Altman assured the Federal Reserve that FGB shares would not be used as collateral to secure any loans made for the stock purchase. *Id.* Similar

---

**2.** Because this matter is before the Court on Defendants' motions to dismiss, the Court, as she must, assumes true the facts alleged in the Complaint.

**3.** In August of 1982, CCAH purchased Financial General and renamed it First American Bankshares. *See* Complaint ¶ 59. At the same time, the holding company FGBHC became First American Corporation ("FAC"). *Id.*

false statements were made to the New York state banking regulators in 1979, *id.* ¶ 47, and to the Federal Reserve in 1980. *Id.* ¶ 49.

5) In the 1980 Federal Reserve Application, Defendants Clifford, Altman and Tuttle falsely stated that "BCCI owns no shares of FGB, CCAH or CCAI, either directly or indirectly, nor will it if the application is approved" and that "[n]either is [BCCI] a lender, nor will it be, with respect to the acquisition by any of the investors of either FGB, CCAI or CCAH shares." *Id.* Defendant Tuttle established the plan to conceal BCCI's involvement as reflected in a memorandum to Defendant Altman:

> [W]e need to decide now what is said in the initial application as to the participation, or not, of Abedi, BCCI and ICIC. While I believe others may feel differently, my view is that because of the legal problems under the Bank Holding Company Act the International Banking Act which their participation would raise as well as the previous publicity, a succinct statement of noninvolvement should be made in the initial filing.

Complaint ¶ 50.

The plaintiffs allege that, while knowing of BCCI's involvement from the outset, Clifford, Altman and Tuttle implemented their plan of concealment. On April 23, 1981, Clifford and Altman appeared before the Federal Reserve, representatives of the Office of the Comptroller of the Currency, and three state bank regulatory agencies. Clifford is alleged to have falsely told them that "[t]here is no function of any kind on the part of BCCI.... I know of no present relationship that exists. I know of no planned future relationship that exists," *id.* ¶ 52, and that any similarity between the names Bank of Credit and Commerce International, Credit and Commerce American Holdings and Credit and Commerce American Investment was a coincidence. *Id.* ¶ 53. Altman is alleged to have falsely stated that "[t]here [was] no connection between [CCAH/CCAI] and BCCI in terms of ownership or other relationship." *Id.* Clifford and Altman are accused of having made similar false statements to the Commission of Virginia Financial Institutions, *id.* ¶ 54 (Clifford), to New York State Senator Manfred Ohrenstein, *id.* ¶ 55 (Altman), and to the Federal Reserve on June 15, 1981, *id.* ¶ 56 (Altman).

Banking regulators relied upon the representations by Clifford, Altman and Tuttle and, on August 25, 1981, the Federal Reserve approved the applications of CCAH, CCAI and their newly formed subsidiary FGB Holding Corporation ("FGBHC") to become bank holding companies by acquiring FGB. *Id.* ¶ 58. In August of 1982, FGB became First American Bankshares, Inc., and FGBHC became First American Corporation (FAC).

### Conflicting roles

Defendants Clifford and Altman then assumed "additional and conflicting roles." *Id.* ¶ 60. Once the Federal Reserve approved the applications, but before the name changes, Clifford became Chairman of the Board of FGB and a Director of CCAH, CCAI and FGBHC while Altman became a Director and Secretary of CCAH and CCAI, a Director and President of FGBHC and a Director of FGB. Plaintiffs contend that "Defendants Clifford and Altman were the effective senior management of First American while at the same time remaining as legal counsel to the BCCI Group." *Id.*

Soon thereafter Clifford and Altman began meeting with Abedi and Swaleh Naqvi (the second highest corporate officer of BCCI from 1973 to 1988 and the top corporate officer after Abedi's 1988 heart attack until April 1990) on a monthly basis to discuss the ongoing performance of First American and its integration with the BCCI Group. *Id.* ¶ 61. Plaintiffs aver that "Defendants Clifford, Altman and Tuttle provided legal advice to the BCCI Group on how to achieve apparent compliance with their false representation that the BCCI Group would not be involved in financing or controlling CCAH's activities, and that the BCCI Group would act solely as 'an advisor and conduit to CCAH's shareholders.' Together with Abedi and Naqvi, Defendants used the cover of this purported advisory relationship to disguise the nominee ownership of CCAH and ultimately First American." *Id.*

### Control through Nominees

After the acquisition of First American, Clifford and Altman are alleged to have engaged in various transactions while simultaneously representing the BCCI Group and First American. In concert with Abedi and Naqvi, Defendants Clifford and Altman developed and implemented a scheme whereby "the finding for nominee purchases of additional CCAH shares would be provided in substantial portion by the BCCI Group." *Id.* ¶ 62. To ensure that the holdings of individual shareholders remained below the thresholds that would trigger regulatory disclosure requirements, allocations of CCAH shares were made "based on secret agreements with nominee shareholders, in which the BCCI Group funded purchase of the shares on a non-recourse basis." *Id.* ¶ 63. As a result of this scheme, the BCCI Group was able to control more than 25 percent of the voting shares of CCAH, in violation of the Bank Holding Company Act. *Id.* ¶ 64. The plaintiffs contend that "[t]his violation was caused by Defendants Clifford's, Altman's and Tuttle's negligent provision of legal advice to the BCCI Group with respect to filing and registration requirements under the U.S. banking laws." *Id.* The plaintiffs also claim, "[o]n information and belief" *id.* ¶ 67, that Defendants Clifford and Altman and the Clifford & Warnke partners billed the BCCI Group for Tuttle's legal work twice: once directly and once indirectly. *Id.* They also declare that Clifford and Altman billed the BCCI Group excessively for certain transactions. *Id.* ¶ 67.

### Clifford and Altman's Fraudulent Stock Purchases

Plaintiffs next contend that in 1986, through a rights offering to CCAH shareholders, Clifford and Altman "were able to make personal investments in CCAH rights shares in no-risk transactions financed by the BCCI Group." *Id.* ¶ 69.[4] The BCCI Group, through BCCI Overseas, loaned Clifford and Altman $9,960,920 and $4,979,352, respectively, to acquire CCAH shares. *Id.* ¶¶ 71 & 73. The loans were on a non-recourse basis with only the shares pledged as collateral. *Id.* ¶ 73. Clifford and Altman purportedly incurred no obligation to pay interest on such loans, id, and the agreements pledging CCAH shares as security were never recorded in the CCAH share registry even though Clifford and Altman, as counsel for the BCCI Group, were required to ensure that all such pledges were registered. *Id.*

The Complaint further recites that at the same time they received these nonperforming secret loans, Clifford and Altman entered into a side agreement with the BCCI Group relating to the CCAH stock purchases. The BCCI Group agreed to buy Clifford and Altman's shares "in such manner, amount, and at such prices as BCCI and the undersigned shall mutually determine." *Id.* ¶ 74. The side agreement also provided that Clifford and Altman were not "obligated personally to repay to BCCI the loan principal or any interest accrued thereon [and that] BCCI shall be limited solely to the undersigned's interest in the CCAH shares and any proceeds thereof to repay the loan and interest thereon." *Id.*

Although the CCAH Board of Directors approved the purchase of stock by Clifford and Altman, the true terms of the purchase were not disclosed to the Directors, banking regulators or the BCCI Group. *Id.* ¶¶ 75 & 76.

In 1988, Altman met with Naqvi and Abedi, advising them that he and Clifford were ready to sell some of their CCAH shares. *Id.* ¶ 79. While Altman wanted to realize a net profit of $1.5 million on his CCAH shares, he advised Naqvi and Abedi that Clifford expected a net profit of $3 million. *Id.* To meet their profit targets, Naqvi caused the BCCI Group to execute a fraudulent transaction in the name of a nominee, Mohammed Mahmoud Hammoud, at the price of $6,800 per share (or 2.6 times book value). *Id.* ¶ 80. The plaintiffs specify that "Clifford and Altman knew that this was not an arms' length commercial transaction and that the shares were being transferred to a nominee in order to generate false profits for

---

4. BCCI Overseas would also loan Clifford and Altman the funds to acquire shares pursuant to a

1987 rights offering. *Id.* ¶ 78.

them." *Id.* Once the transactions were executed, Clifford received $7,248,680.93 and Altman received $3,626,799.27, pre-tax, which represented approximately $3.2 million and $1.6 million, respectively, after taxes. *Id.* ¶¶ 82–84.

Plaintiffs further allege that Clifford and Altman entered into a separate agreement eliminating any risk that the shares they retained after the 1988 sale would decrease in value. On April 26, 1988, the BCCI Group agreed to repurchase all shares retained by Defendant Clifford on his death at a price of $2310.00 per share; Altman obtained a similar deal. *Id.* ¶ 86. These agreements also applied to convertible debentures issued by CCAH and purchased on or about December 4, 1990, by Clifford and Altman, to maintain the value of their interests in First American, in the amounts of $249,000 and $123,000, respectively. *Id.* ¶ 87. The plaintiffs claim that Defendant Altman made a series of false statements to conceal those financial arrangements. *Id.* ¶¶ 88–93.

### The Collapse of BCCI

The plaintiffs allege that as a result of massive fraud, including the fraudulent actions described in the Complaint (and summarized above), such as the secret ownership of First American, the BCCI Group collapsed, resulting in its seizure by banking regulators in the United States, the United Kingdom and Luxembourg, among other countries, on or about July 5, 1991. In the United States, the BCCI Group pled guilty to violations of 18 U.S.C. § 1962(d), which led to the forfeiture of its assets. *Id.* ¶ 95.

### The Complaint

The plaintiffs' Complaint consists of nine counts. Count I alleges that Defendants Clifford, Altman, Tuttle and the Clifford & Warnke partners breached the fiduciary duties that they owed to the BCCI Group due to their intentional, reckless and/or negligent actions, such as their simultaneous representation of both the BCCI Group and CCAH, First American's parent corporation, in the illegal acquisition and maintenance of ownership of First American. *Id.* ¶¶ 97–103. In Count II, the plaintiffs aver that Defendants Clifford, Altman, Tuttle and the Clifford & Warnke partners negligently failed to

provide proper advice to the BCCI group. *Id.* ¶ 106. "The Clifford & Warnke partners, as counsel employed by the BCCI Group, as recipients of legal fees and as partners of Clifford and Altman are directly and/or vicariously liable for the negligence of Defendants Clifford and Altman." *Id.* ¶ 107. Count III charges negligent supervision by the Clifford & Warnke partners, *id.* ¶ 110. and Count IV contends that Defendants Clifford, Altman, Tuttle and the Clifford & Warnke partners are liable for fraudulent concealment by Defendants Clifford and Altman. *Id.* ¶¶ 114–115. In Counts V, VI and VII, respectively, the plaintiffs allege common law fraud, conversion and unjust enrichment by Clifford and Altman due to the stock transactions. *Id.* ¶¶ 118–119, 122, & 125. Count VIII asserts unjust enrichment by Clifford, Altman, Tuttle and the Clifford & Warnke partners due to improper billing practices, *id.* ¶ 127, and Count IX is against Clifford and Altman under RICO, 18 U.S.C. §§ 1962(b), (d).

## II. Discussion

The defendants' motions to dismiss are premised on the notion that the BCCI Group, as the "active and knowing instigator of a complex fraudulent scheme [cannot] seek compensation from third parties for injuries it suffered as a result of its own managers' intentional pursuit of its felonious mission." Clifford and Airman's ("C & A's") Motion to Dismiss, at 5; *see* Clifford & Warnke partners' Motion to Dismiss, *passim.* The plaintiffs, however, view the situation differently: the defendants' wrongdoing should not be excused because of the parallel culpability of their co-conspirators, the corrupt senior managers of BCCI. *See* Plaintiffs' Opposition, at 1.

The defendants' theories of dismissal can be broken down into the following categories: (1) collateral estoppel and principles of agency law; (2) statute of limitations; (3) the substantive claims; (4) the effect of bankruptcy on a Clifford & Warnke partner's liability, which pertains solely to Defendant Stovall's claim; and (5) the liability of certain Clifford & Warnke partners, which pertains to the claims of Defendants Duff, Hecht and

Cortese. Each theory will be addressed in turn.

### 1. Whether the knowledge and actions of BCCI's agents should be imputed to the plaintiffs and whether the plaintiffs are collaterally estopped

The defendants contend that the knowledge and conduct of Abedi and Naqvi operate to bar the plaintiffs from bringing this action due to issue preclusion and principles of agency law.[5] First, the defendants argue that BCCI's guilty plea is conclusive proof of the underlying facts, which establish corporate knowledge and estop the corporate defendants from pursuing a subsequent civil action as plaintiffs. Second, and independent of the collateral estoppel argument, they claim that the actions and knowledge of a corporation's officers are imputed to the corporation under general principles of agency law. Under this theory, they contend that the plaintiffs, not the defendants named in this suit, bear the legal responsibility for the acts done in BCCI's name.

### Issue preclusion

█ A conviction based on a guilty plea may conclusively establish certain facts and operate preclusively in a subsequent civil proceeding. *See Otherson v. Department of Justice, INS,* 711 F.2d 267, 271 (D.C.Cir. 1983); *see, e.g., International Telecommunications Satellite Org. v. Colino,* Civ. No. 88–1266, 1992 WL 93129, *5 (D.D.C. Apr. 15, 1992), op. amended on other issues,* 1992 WL 151809 (Jun. 9, 1992). On the other hand, it may not. *See, e.g., Haring v. Prosise,* 462 U.S. 306, 317, 103 S.Ct. 2368, 2375, 76 L.Ed.2d 595 (1983); *Linnen v. Armainis,* 991 F.2d 1102, 1105 (3d Cir.1993). "It should be remembered ... that issue preclusion is appropriate in only certain circumstances and is subject to important exceptions to prevent unfairness." *Otherson,* 711 F.2d at 272 (citing *Restatement (Second) of Judgments* §§ 27–29 (1982)); *see also Montana v. United States,* 440 U.S. 147, 155, 162–63, 99 S.Ct. 970, 974, 978–79, 59 L.Ed.2d 210 (1979).

*See generally* 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4474, at 759–760 (1981 & 1996 Supp.) (recognizing, but criticizing, the use of a conviction based on a plea of guilty to collaterally estop civil litigant).

█ Issue preclusion is appropriate only if certain prerequisites have been satisfied:

> First, the issue must have been actually litigated, that is, contested by the parties and submitted for determination by the court. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in the first trial. Third, preclusion in the second trial must not work an unfairness. Preclusion is sometimes unfair if the party to be bound lacked an incentive to litigate in the first trial, especially in comparison to the stakes of the second trial.

*Otherson,* 711 F.2d at 273 (citations and internal quotations omitted).

█ In light of the principles outlined above in connection with the unique circumstances of this case, the doctrine of issue preclusion will not be applied to bar the plaintiffs from bringing this suit. There are two principal reasons for this determination. First, and contrary to the defendants' claim, the entry of the corporate defendants' guilty plea did not, and does not, constitute actual litigation of the issues presented by this civil suit. "Indeed, no issue was 'actually litigated' in the [plea] proceeding since [BCCI] declined to contest its guilt in any way." *Prosise,* 462 U.S. at 316, 103 S.Ct. at 2374; *see Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 157, 83 S.Ct. 554, 561–62, 9 L.Ed.2d 644 (1963). While the Court has no way of knowing all of the reasons why any criminal defendant enters a plea of guilty, in this case, it appears that one reason the corporate defendants may have decided not to contest guilt was because the Plea Agreement offered to resolve "all criminal investigations, charges, indictments and all criminal and civil proceedings against BCCI." Plea Agreement, at

---

**5.** This argument is presented separately by Defendant Tuttle, Defendants Clifford and Altman and the Clifford & Warnke partners. Defendants Tuttle and the Clifford & Warnke partners adopted the memorandum of Defendants Clifford and Altman. Defendant Yolles adopted all of the motions filed by or on behalf of Defendants Clifford and Altman, and the Clifford & Warnke partners.

5. In any event, due to the nature and circumstances surrounding guilty plea proceedings, courts are, as they should be, wary of relying upon a guilty plea to establish a broad, preclusive effect. *See Ohio v. Johnson,* 467 U.S. 493, 500 n. 9, 104 S.Ct. 2536, 2541 n. 9, 81 L.Ed.2d 425 (1984); *Otherson,* 711 F.2d at 275 & n. 8.

Second, and more compelling, giving the guilty plea preclusive effect would result in extreme unfairness under the unique facts and circumstances of this case. *See Montana v. United States,* 440 U.S. at 155, 99 S.Ct. at 974; *Otherson,* 711 F.2d at 272. The Plea Agreement expressly provided that the entry of the plea "is not intended by the parties hereto to preclude the criminal prosecution or any civil action against any culpable BCCI officers, employees, agents or other entities (other than BCCI) or wrongdoers." Plea Agreement at 6; *see also* Transcript of Arraignment at 67. To interpret the Plea Agreement contrary to the intent of the parties, and this Court's understanding when she accepted that plea, would be unjust.

**Principles of agency law**

■ The defendants' second argument is based upon principles of agency law. As a general rule, knowledge acquired by a corporation's officers or agents is properly attributable to the corporation itself. 3 *Fletcher Cyc. Corp.* § 790, at 15 (Perm. ed.1994); *see FDIC v. Ernst & Young,* 967 F.2d 166, 170–71 (5th Cir.) ("Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization.") (quoting *Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365, 1376 (5th Cir.1983)), *r'hg denied,* 976 F.2d 732 (1992). This is true whether the officer or agent has actually disclosed the information to the corporation. 3 *Fletcher Cyc. Corp.* § 790, at 15–16. The reason for the rule is simple: it is the duty of the officer or agent to communicate his or her knowledge to the corporation, and the law presumes that the officer or agent has carried out this duty. *Id.* § 819, at 116; *see McHugh v. Duane,* 53 A.2d 282, 285 (D.C.Mun.1947). The rule provides a mechanism to impute liability to a principal acting through an officer or agent in order to protect innocent third parties; it is not intended to serve "as a shield for unfair dealing." 3 *Fletcher Cyc. Corp.* § 804, at 55; *see Mutual Life Ins. Co. v. Hilton–Green,* 241 U.S. 613, 623, 36 S.Ct. 676, 680, 60 L.Ed. 1202 (1916); *Bowen v. Mount Vernon Sav. Bank,* 105 F.2d 796, 799 (D.C.Cir.1939).

■ There are, however, a number of exceptions to this rule. The first exception, relevant here, is that "there will be no imputation of knowledge if the officer or agent is adversely interested" to the corporation. 3 *Fletcher Cyc. Corp.* § 790, at 16; *id.* § 819. at 116; *FDIC v. Shrader & York,* 991 F.2d 216, 223 (5th Cir.) ("courts will generally not impute a bank officer or director's knowledge to the bank if the officer or director acts with an interest adverse to the bank"), *r'hg denied,* 999 F.2d 1581 (1993), *cert. denied,* 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *Ernst & Young,* 967 F.2d at 170 ("Generally, courts impute a bank officer or director's knowledge to the bank unless the officer or director acts with an interest adverse to the bank."). This exception follows logically from the rule's purpose. It cannot be presumed that an officer or agent will communicate knowledge to a corporation where "it is to the agent's own interest not to impart the knowledge to the principal." 3 *Fletcher* § 819 at 116;[6] *id.* § 820, at 123; *see* Restatement (Second) of Agency § 282(1) (1957); *see also Shrader & York,* 991 F.2d at 223.

■ While the general rule of imputation applies only to protect innocent third parties, *see Bowen,* 105 F.2d at 799, the adverse interest exception applies only to fraud *against* the corporation, not to fraud *on behalf* of the corporation. *Ernst & Young,* 967

---

**6.** *See also id* at 116–17 ("where an officer is dealing with the corporation in the officer's own behalf, or is, for any other reason, interested in a transaction adversely to the corporation, knowledge possessed by the officer in the transaction is not imputable to the corporation") (footnote omitted). This exception has also been justified by reasoning that the agent or officer is really acting on his or her own behalf and, thus, does not receive notice as an agent or officer of the corporation. 3 *Fletcher Cyc. Corp.* § 820, at 122–23.

F.2d at 171 (and cases cited therein); 3 *Fletcher Cyc. Corp.* § 819, at 118. In the former case, the corporation is itself harmed by the fraud, while in the latter the corporation and its shareholders actually benefit from the fraud to the detriment of the corporation's creditors. *Ernst & Young*, 967 F.2d at 171; *see Shrader & York*, 991 F.2d at 224.

■ The plaintiffs invoke this adverse interest exception. *See* Complaint ¶¶ 38, 96. The defendants, however, contend that the exception is not available as a matter of law and, alternatively, that the plaintiffs have failed to plead sufficient facts to establish its application. While the plaintiffs need not allege all that they must eventually prove, they have alleged sufficient facts to survive the defendants' motions to dismiss. In addition to detailed allegations regarding the contour of the scheme, *see, e.g.*, Complaint ¶¶ 39–67, the plaintiffs declare: "In engaging in illegal actions with Defendants and others alleged herein, Abedi and Naqvi were acting beyond the scope of their actual or apparent authority, in breach of their fiduciary duties and adversely to the interest of the BCCI Group as corporate entities and the depositors and creditors of the BCCI Group." *Id.* ¶ 38. In deciding the pending motion, "the factual allegations of the complaint must be taken as true, and any ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the pleader." *Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985). The motions to dismiss will be denied.

Contrary to the defendants' claim, whether the exception applies only to agents who act *solely* in their own interests does not dispose of the case at the motion to dismiss stage. The plaintiffs are entitled to all reasonable inferences and, accepting for the present that the defendants have identified the proper standard, *see* C & A's Motion to Dismiss, at 16 (citing, *inter alia*, *Columbia Plaza Corp. v. Security Nat'l Bank*, 676 F.2d 780, 786–88 (D.C.Cir.1982)), it is appropriate to construe the Complaint liberally. *See* 5A Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1357, at 337–40 (1990). Moreover, while the plaintiffs must eventually prove that BCCI's agents acted against its inter-

ests rather than on its behalf, the Complaint pleads sufficient facts to survive the defendants' motions: "the BCCI Group was adversely dominated by corrupt prior senior managers and directors, who, in conjunction with Defendants Clifford and Altman engaged in the harmful acts," Complaint ¶ 96, which led to the BCCI Group's disastrous financial condition and worldwide collapse. *See, e.g., id.* ¶ 94.

While *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), commands that state law provides the rule of decision regarding imputation, the defendants' contention that D.C. law broadly proscribes application of the adverse interest exception is unpersuasive. The principal case of *Bowen v. Mount Vernon Sav. Bank*, 105 F.2d 796 (D.C.Cir.1939), involved a bank president (Donaldson) and vice-president (Baden), both of whom were also the bank's directors and executive committee members. Baden and Donaldson extended a promissory note to a third party in violation of the District of Columbia's usury laws. 105 F.2d at 797–98. They later sold the note to another bank, Mount Vernon Savings Bank, of which they were also directors and executive committee members. At issue in the case was whether Mount Vernon purchased the note without notice of the usury since there was no evidence that either Baden or Donaldson disclosed the same.

The district court dismissed the suit, but the Court of Appeals reversed, imputing Donaldson and Baden's knowledge to Mount Vernon. The Court of Appeals based its decision on the fact that there was no evidence of adversity: "They doubtless considered the transaction a profitable one for both." *Id.* at 799. The Court stated that "where, as in this case. it does not appear that the agent acted unfairly toward his principal, or even that he would have derived any advantage from doing so, the principal should be charged with the agent's knowledge." *Id.*

The defendants' stretch *Bowen* beyond its reach, and they appear to ignore the qualifying language regarding when the principal is to be charged with an agent's knowledge. Although *Bowen's* dicta might be construed

as being critical of the exception,[7] the court recognized the exception's existence, finding it inapplicable due to a lack of adversity. The *Bowen* court did make clear, however, that the imputation doctrine was intended to apply only in favor of innocent third parties:

> The Supreme Court has held that if a company's agents withhold knowledge from it, even fraudulently, that fact "cannot alter the legal effect of their acts or of their knowledge *with respect to the company in regard to third parties who had no connection whatever with them in relation to the perpetration of the fraud, and no knowledge that any such fraud had been perpetrated.*"

105 F.2d at 799 (quoting *Armstrong v. Ashley,* 204 U.S. 272, 283, 27 S.Ct. 270, 274, 51 L.Ed. 482 (1907)) (emphasis added).

■ That the imputation doctrine is not available for the benefit of wrongdoers who seek to shield their wrongful acts is a well-established principle:

> The rule imputing an agent's knowledge to the principal is designed to protect only those who exercise good faith, and is not intended to serve as a shield for unfair dealing by the third person. The rule may not be invoked where third persons use the

agent to further their own frauds upon the principal or where the third person did. not intend or expect that the agent would communicate the facts or the truth to the principal as where the third person colludes with the agent in acting adversely to the principal.

3 *Am.Jur.2d Agency* § 295 (2d ed.1986) (citing cases); *see also* 3 *Fletcher Cyc. Corp.* § 804, at 55; *Hilton–Green,* 241 U.S. at 623, 36 S.Ct. at 680; *Shrader & York,* 991 F.2d at 222.

Here, the plaintiffs have pled sufficient facts to support their general allegations that corrupt senior BCCI officials operated a scheme, with the collusion of Clifford and Altman, which led to the BCCI Group's financial collapse and eventual demise. Assumed to be true, the facts alleged by the plaintiffs make clear that the imputation doctrine is not available here to shield the defendants from being held accountable for their wrongdoing.[8]

### 2. Whether the claims are barred by the statute of limitations

■ The defendants contend that the statute of limitations expired for all of the claims before the suit was filed on July 1, 1994. The plaintiffs counter that the statute

---

7. After concluding that the agents lacked adversity, the court explained that the reason for the rule is to avoid. injustice. A principal cannot be allowed to "avoid, by acting vicariously, burdens to which he would become subject if he were acting for himself. The so-called presumption that the principal knows what the agent knows is irrebuttable; it cannot be avoided by showing that the agent did. not in fact communicate his knowledge. It *should* follow that it cannot be avoided by showing that the agent had such an adverse interest that he would not be likely to communicate his knowledge." 105 F.2d at 799 (emphasis added).

The defendants' interpretation of *Bowen* would allow wrongdoers to hide-behind the imputation doctrine—a result at odds with *Bowen's* language and reasoning. The dicta upon which the defendants rely simply does not provide a reasonable basis to conclude that *Bowen* stands for the broad proposition that the law of the District of Columbia *always* bars application of the adverse interest exception to the general rule of imputation.

8. Defendant Tuttle argues that he is differently situated than the other defendants, because as outside counsel, he was neither a Clifford &

Warnke partner nor possessed of the same conflicts of interest that the plaintiffs allege plague Clifford and Altman. Tuttle's motion is unpersuasive. The plaintiffs aver that Tuttle acted as legal counsel to the BCCI Group and to record shareholders of CCAH and FGB, as well as legal counsel to First American. Complaint ¶ 18. They further allege that these roles gave rise to conflicting interests, *see id.* ¶ 41, and that, along with Clifford and Altman, Tuttle assisted in the preparation and submission of multiple false and misleading documents in order to conceal the scheme concocted by BCCI's corrupt senior managers. *See, e.g., id.* ¶¶ 42, 49–51, 57–59 & 65. As a result of his advice and actions, the plaintiffs contend that Tuttle breached his fiduciary duty (Count I), failed to exercise reasonable care in providing proper advice (Count II), engaged in acts of fraudulent concealment (Count IV) and was unjustly enriched (Count VIII). Even assuming Tuttle's participation was of a different quality and nature than that of his codefendants, the plaintiffs assert sufficient facts of actionable wrongdoing. At this stage, the imputation doctrine is unavailable to any of the defendants, including Defendant Tuttle, to shield them from the consequences of their alleged wrongdoing.

of limitations did not begin to run until July 5, 1991, because until then "the BCCI Group was adversely dominated by corrupt senior managers and directors." Complaint ¶ 96. Under this theory, "a cause of action will be tolled during the period that a plaintiff corporation is controlled by wrongdoers." *RTC v. Gardner*, 798 F.Supp. 790, 795 (D.D.C.1992); *see* 3A *Fletcher Cyc. Corp.* § 1306.20 at 686 ("the statute is tolled while a corporate plaintiff continues under the domination of the wrongdoers").

█ The plaintiffs' factual allegations are sufficient to withstand the motion to dismiss. As noted above, the Court will not impute the knowledge of the defendants or of BCCI's corrupt senior managers and directors to the plaintiffs. Whether the BCCI Group was adversely dominated and, if so, when such domination ceased are questions of fact that cannot be resolved on a motion to dismiss prior to discovery.[9]

### 3. The substantive claims

**Breach of Fiduciary Duty**

In Count I, the plaintiffs contend that the defendants breached the fiduciary duties that they, as counsel, owed to the BCCI Group through the simultaneous representation of "the BCCI Group and CCAH in the illegal acquisition and maintenance of First American." Complaint ¶ 99. Defendants Clifford and Altman argue that this count should be dismissed because no irreconcilable conflict of interest can be found. According to Clifford and Altman, simultaneous representation of these two entities involved the representation of two clients with the same interests, "a decidedly odd basis for allegations of 'conflict.'" C & A's Motion to Dismiss, at 25; *see* Tuttle's Motion to Dismiss, at 20–21; Clifford & Warnke partners' Motion to Dismiss, at 5. Additionally, the Clifford & Warnke part●ers and Defendant Tuttle argue that the plaintiffs are barred

from suing the defendants due to BCCI's own fraudulent acts. The defendants also claim that no cognizable damage is alleged because there is no nexus between the conflict and ai allegation that the Clifford & Warnke partners were caused to exercise poor judgment as a result of the divided allegiances. The plaintiffs counter that the Complaint adequately alleges that the BCCI Group and First American had differing interests sufficient to trigger application of the defendants' duties as attorneys to avoid. conflicts of interest.

█ A breach of an attorney's ethical standards can constitute a breach of the fiduciary duty owed to a client. *Hendry v. Pelland*, 73 F.3d 397, 401 (D.C.Cir.1996) (citing *Griva v. Davison*, 637 A.2d 830, 846–47 (D.C. 1994)), *r'hg denied*, (Mar. 5, 1996). A lawyer is required to decline employment "if the exercise of his independent professional judgment ... would be likely to involve him in representing differing interests [unless] it is obvious that he can adequately represent the interest of each [client] and ... each consents to the representation after full disclosure." *Hendry*, 73 F.3d at 401 (citing D.C.Code of Professional Responsibility DR 5–105). Unless the clients consent after full disclosure, the duty of undivided loyalty is breached where a lawyer represents clients with conflicting interests. *Id.* Lawyers are also prohibited from placing their own interests above those of their clients. *See* DR 5–101(A); DR 5–104(A).

█ The Complaint states a cognizable claim. Among the conflicts alleged were the defendants' simultaneous representation of the BCCI Group and CCAH, First American's parent. The plaintiffs allege that the secret and illegal acquisition of First American by BCCI placed the defendants in a clear conflict of interest because BCCI and CCAH had interests that were inimical and likely to

---

9. Defendant Tuttle contends that the adverse domination theory to toll the statute of limitations can only be applied to corporate insiders. While it is not clear why corporate outsiders who engage in actionable conduct should be entitled to such a benefit where their conduct has been concealed through the adverse domination. it is

clear that "the doctrine has been applied in cases involving defendants who were neither officers nor directors of the corporation," *Gardner*, 798 F.Supp. at 795 (citing cases), and it is appropriate to construe D.C. law similarly. Defendant Tuttle's argument is rejected.

lead to litigation. *See* Complaint ¶ 99.[10] The plaintiffs also state that nonrecourse multimillion dollar loans were accepted by Clifford and Altman, but were not disclosed or recorded. *Id.* ¶ 76. Moreover, "[t]he true terms of the loans to Defendants Clifford and Altman were misrepresented to the BCCI Group." *Id.* ¶ 76. Profiteering at the expense of a client constitutes a *per se* violation of DR 5–104(A). *See also* D.C. Rule of Professional Conduct, Rule 1.8. Further, it is their contention that the defendants' "continuous and ongoing breach of their fiduciary duties," *id.* ¶ 103, was the direct and proximate cause of the injuries sustained by "the BCCI Group as well as its depositors and creditors." *Id.* Put simply, the plaintiffs have pled sufficient facts to prevail on a motion to dismiss.

The argument that the plaintiffs are precluded from suing their counsel fails, because, at this stage, the Court has rejected the defendants' imputation theory. *See Carmel v. Clapp & Eisenberg, P.C.,* 960 F.2d 698, 704 (7th Cir.1992); *Diamond Mortgage Corp. of Ill. v. Sugar,* 913 F.2d 1233, 1248 (7th Cir.1990), *cert. denied,* 498 U.S. 1089, 111 S.Ct. 968, 112 L.Ed.2d 1054 (1991).

### Negligence

Count II alleges that the defendants negligently failed to provide legal advice to the BCCI Group, and Count III avers that the Clifford & Warnke partners negligently failed to supervise and monitor the provisions of legal services by members and employees of the firm. The defendants move for dismissal contending that their legal advice was accurate and that the plaintiffs cannot state a claim for negligence merely because the BCCI Group used that legal advice for its own nefarious purpose: i.e., to evade U.S. regulatory requirements. Since the Court has, at the Rule 12(b)(6) stage, declined to impute the actions of BCCI's corrupt senior managers and officers to the plaintiffs, the defendants' argument again collapses. *See Diamond Mortgage,* 913 F.2d at 1248. As to Count III, negligent supervision is a cognizable claim in the District of Columbia. *See, e.g., Anderson v. Hall,* 755

F.Supp. 2, 5 (D.D.C.1991); *American Security Bank v. American Motorists Ins. Co.,* 538 A.2d 736, 738 (D.C.1988).

### Fraudulent Concealment

In Count IV, the plaintiffs allege fraudulent concealment contending that Clifford and Altman "misrepresented and concealed material facts relating to the identity ... of the purchasers of Financial General Bankshares shares [and of] CCAH shares." Complaint ¶ 114. The plaintiffs seek to hold Defendant Tuttle liable on an aiding and abetting theory and the Clifford & Warnke partners on a vicarious liability theory. *Id.* ¶¶ 113 & 114. The defendants argue that there was no concealment, because BCCI had all of the pertinent facts. This argument fails for the same reason that the Court rejected the defendants' attack on the negligence count. Absent imputation of the knowledge of the corrupt senior managers and officers to the plaintiffs, the Complaint states a cognizable claim. The defendants' argument will be rejected.

### Counts Arising out of the Stock Transactions

The defendants next attack Counts I, V, VI, VII and IX. In these counts, the plaintiffs claim that Clifford and Airman's actions in negotiating and accepting nonrecourse loans and purchasing CCAH shares violated their fiduciary duties (Count I), and constituted actionable fraud (Count V), conversion (Count VI) and unjust enrichment (Count VII). The defendants contend that these counts are infirm because Abedi and Naqvi, senior BCCI officers, played central roles. They attack the RICO claim (Count IX) on three grounds: (1) that the plaintiffs have failed to identify any racketeering activity; (2) assuming the presence of racketeering activity, the plaintiffs have failed to allege a pattern of such activity; and (3) the plaintiffs have failed to plead a legally cognizable acquisition injury under 18 U.S.C. § 1962(b).

The defendants' common law attack is again blunted by the fact that the Court has not imputed Abedi's and Naqvi's knowledge

---

10. The defendants' contention that the BCCI Group and CCAH enjoyed a merger of interests on all relevant issues is unpersuasive, and it is insufficient to prevail at this stage.

or conduct to the plaintiffs. Count IX, asserted under RICO, will also survive Clifford and Altman's motion to dismiss, but for different reasons.[11]

 Section 1962(b) "makes it unlawful to acquire control of an enterprise through a pattern of racketeering activity." *Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.,* 941 F.2d 1220, 1231 (D.C.Cir.1991). As a result, one of the elements that a plaintiff must allege (and, of course, ultimately prove) is that it suffered an " 'acquisition' injury, analogous to the 'use or investment injury' required under § 1962(a)." *Id.* (quoting *Old Time Enters., Inc. v. International Coffee Corp.,* 862 F.2d 1213, 1219 (5th Cir.1989)). This injury is that which "aris[es] from the acquisition or maintenance of an interest in or control of an enterprise." *Danielsen,* 941 F.2d at 1231. It is to be distinguished from the injury which results from the predicate acts themselves. *Id.* at 1230-31; *see Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.,* 57 F.3d 56, 92 (1st Cir.) (plaintiffs must prove "harm beyond that resulting from the fraud which constituted the predicate act"), *cert. denied,* ── U.S. ──, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995); *Casper v. Paine Webber Group, Inc.,* 787 F.Supp. 1480, 1494 (D.N.J. 1992) ("a plaintiff must allege injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts").

 The defendants contend that the plaintiffs have failed to meet their burden to plead racketeering activity, a pattern of such activity, or acquisition injury sufficient to satisfy the requirements of RICO. The Court disagrees. The plaintiffs have met their pleading burden by alleging with specificity various acts of wire fraud and mail fraud.[12] *See* Jed S. Rakoff & Howard W. Goldstein,

*RICO: Civil and Criminal Law and Strategy* §§ 1.04[1][d], 2.01[2] (1996). The scienter requirements for wire and mail fraud can be inferred from the detailed pattern of conduct alleged in the Complaint. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir. 1990); *Schrag v. Dinges,* 788 F.Supp. 1543, 1550-51 (D.Kan.1992); *see* Rakoff & Goldstein, *supra* § 2.02[1][d].

The fact that Abedi and Naqvi may have participated in the scheme is not fatal, particularly where the plaintiffs have described in detail a pattern of racketeering activity by Defendants Clifford and Altman through numerous related instances of mail and wire fraud over a three-year period. *See* Complaint ¶¶ 135–157. Clifford and Altman's alleged "no-risk" acquisition of CCAH shares in 1986 and 1987, as well as their 1988 stock "sale," the guaranteed "repurchase" agreement at a set value, and their 1990 participation in the convertible debenture issue establish predicate acts sufficiently related to BCCI's fraudulent takeover of First American. It is charged that these acts were part of a long-term association for criminal purposes, *Edison Elec. Inst. v. Henwood,* 832 F.Supp. 413, 417–18 (D.D.C.1993), and they were neither isolated events nor sporadic activity, *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 237–39, 109 S.Ct. 2893, 2899–2900, 106 L.Ed.2d 195 (1989), involving injury to multiple victims. *Id.* at 240, 109 S.Ct. at 2901. In sum, the Complaint sufficiently pleads "continuity plus relationship" to establish the requisite pattern of conduct under RICO. *Id.* at 239, 109 S.Ct. at 2900; *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

 The alleged acquisition injury stems from Clifford and Altman's acquisition of CCAH shares, directly funded by the no-

---

**11.** RICO makes it "unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b)

**12.** The Complaint does, however, fail to allege that BCCI operated a branch or agency pursuant

to 12 U.S.C. §§ 3101(1), (3), which is necessary to establish a predicate offense of bank fraud in violation of 18 U.S.C. § 1344. *See* 18 U.S.C. § 20(9) (defining financial institution as a branch or agency of a foreign bank as defined by 12 U.S.C. § 3101). However, the wire fraud and mail fraud allegations are sufficient to save the count from dismissal.

interest, risk-free loans from BCCI with guaranteed buy-back provisions. The plaintiffs state that Clifford and Altman "sold" their shares back to the BCCI Group through a nominee arrangement and at inflated values. Clifford and Altman's alleged fraudulent acquisition of the CCAH shares, combined with the guaranteed return at inflated values and with a promise of future payments, are said to have caused injury. This is sufficient to plead cognizable acquisition injury. *See* Rakoff & Goldstein, *supra* § 1.06[2]; *see. e.g., Schrag,* 788 F.Supp. at 1552; *Perez–Rubio v. Wyckoff,* 718 F.Supp. 217, 242 (S.D.N.Y.1989); *Long Island Lighting Co. v. General Elec. Co.,* 712 F.Supp. 292, 298 (E.D.N.Y.1989).[13]

### 4. *Defendant Stovall's claim*

Defendant Stovall moves for dismissal on the ground that the plaintiffs' claims against him were fully discharged through his "no asset" personal bankruptcy.[14] Stovall filed for bankruptcy on June 30, 1992, and he was discharged on June 14, 1993, pursuant to 11 U.S.C. § 727. Relying upon 11 U.S.C. § 727(b), Stovall contends that he was discharged from all debts that arose prior to the date of the order of relief, and that the plaintiffs' claims against him must be construed as a pre-petition debt because the operative facts underlying the plaintiffs' claim occurred long before he filed for bankruptcy. Additionally, he argues that only the bankruptcy court has jurisdiction regarding his discharged debts, and thus, it is the proper forum to entertain any challenge to his bankruptcy discharge.

However, the plaintiffs contend that Defendant Stovall "cannot escape liability because debts arising from breaches of fiduciary duties and fraud are not .dischargeable." Plaintiffs' Opposition, at 54. Alternatively, they argue that Stovall's liability was not discharged, because he failed to schedule the debt in his bankruptcy proceedings.

 Section 523(a) of the Bankruptcy Code exempts from discharge any debt "to the extent obtained by ... false pretenses, a false representation, or actual fraud" or by "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. §§ 523(a)(2), (a)(4). "[D]efalcation is not a synonym for fraud, embezzlement, or misappropriation, but has a broader meaning relative to the failure of a fiduciary to account for money received in a fiduciary capacity as a result of misconduct." Benjamin Weintraub & Man Resnick, *Bankruptcy Law Manual* ¶ 3.09[4], at 3–35 (1980). Partners are fiduciaries within the meaning of Section 523(a)(4). *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir. 1986).

 Contrary to his characterization, Stovall is not merely charged with vicarious liability for Clifford and Altman's conduct. *See* Defendant Stovall's Motion to Dismiss, at 1. The plaintiffs assert that Stovall breached his fiduciary duty to the BCCI Group through "intentional, reckless and/or negligent" actions (Count I) and that the Clifford

---

**13.** The defendants argue that "BCCI is not able to allege" that it was "in any sense injured by the acquisition or maintenance of CCAH shares" by Clifford and Altman. *See* C & A's Reply, at 23. But this is precisely what the plaintiffs have alleged, and while it is another matter whether they can prove such injury, their allegations satisfy their pleading burden:

As a direct and proximate result and by reason of Defendants Clifford and Altman's acquisition and maintenance of an interest in First American, in violation of 18 U.S.C. § 1962(b), and Defendants Clifford and Altman's conspiracy to acquire and maintain an interest in First American, in violation of 18 U.S.C. § 1962(d), the BCCI Group, and their respective depositors and creditors. have been injured in their business and property. As a result of this fraudulent scheme, and in particular the illegal

buy-back arrangements and the illegal sale and retention of CCAH shares, the assets of the BCCI Group were disbursed as loans secured by CCAH shares. These loans were made on non-commercial terms, at a preferential interest rate, to the detriment of the BCCI Group and its depositors and creditors. In addition, Defendants Clifford and Altman sold shares to a BCCI Group nominee in a non-market transaction and retained for themselves shares paid for by the BCCI Group. These losses are a direct result of the conspiracy to defraud.

Complaint ¶167.

**14.** The plaintiffs contest whether his bankruptcy was, in fact, a "no asset" bankruptcy. *Compare* Plaintiffs' Opposition, at 56 n. 35 *with* Stovall's Motion to Dismiss, at Ex. A. 1. Because of the result herein, the Court does not need to reach this question.

& Warnke partners, which includes Stovall, were unjustly enriched through double billing and billing for work that was not performed (Count VIII). Moreover, the alleged fraud by Stovall's partners, Clifford and Altman, can be imputed to him as a bankruptcy debtor, regardless of his actions or knowledge. *In re Calhoun,* 131 B.R. 757, 760 (Bankr.D.D.C.1991); *see also In re Luce,* 960 F.2d 1277, 1282 (5th Cir.1992).

■ Further, Stovall's contentions that the bankruptcy court has exclusive jurisdiction over this matter and that this Court is thus barred under 11 U.S.C. § 524 from entertaining this suit are meritless. Federal district courts have original jurisdiction (although not exclusive jurisdiction) over civil proceedings arising under, or related to, bankruptcy. 28 U.S.C. § 1334(b). This includes the jurisdiction to hear dischargeability actions. *See* 3 *Collier on Bankruptcy* ¶ 523.05A, at 523–17 to 523–18 (15th ed.1996). On the other hand, a bankruptcy court's jurisdiction is neither original nor exclusive, *see Matter of Richardson,* 52 B.R. 527, 528–29 n. 1 (Bankr.W.D.Mo.1985), but is derived from that of the district court. 3 *Collier on Bankruptcy* ¶ 523.05A, at 523–17 to 523–18 (describing restructuring of bankruptcy courts as adjuncts of district courts after the jurisdictional scheme of 28 U.S.C. § 1471(b) was declared unconstitutional by the Supreme Court in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)*); see In re American Solar King Corp.,* 92 B.R. 207, 209 (W.D.Tex.1988). Bankruptcy courts *may* hear all cases and "core" proceedings under Title 11, U.S.Code, including determinations as to the dischargeability of certain debts. *Id.* Moreover, under 28 U.S.C. § 157(d), automatic referrals to bankruptcy courts *must* be withdrawn "if the matter involves law that should or must be adjudicated by an Article III court." *In re American Solar King Corp.,* 92 B.R. at 209.

■ While the bankruptcy court does not have exclusive jurisdiction to determine the dischargeability of Stovall's debts, neither does 11 U.S.C. § 524(a) bar the instant suit to determine Stovall's liability. The purpose of the litigation bar under § 524 was to end the harassment of discharged debtors by prohibiting creditors from attempting to collect *debts* in state courts. *Houghton v. Foremost Financial Serv. Corp.,* 724 F.2d 112, 116 (10th Cir.1983); *see* 3 *Collier on Bankruptcy* ¶ 524.01[2], at 524–11 to 524–16. This provision does not preclude a federal court from hearing a matter involving *liability* for a debtor's alleged breach of fiduciary duty, particularly where issues arise that are properly decided by an Article III court. *See In re American Solar King,* 92 B.R. at 209; *see also In re Horton,* 87 B.R. 650, 652 (Bankr. D.Colo.1987) ("Simply stated, the discharge under § 524 extinguishes the debt, not the liability"). Of course, if the debt has not been discharged, there is no bar to litigation. *Collier on Bankruptcy* ¶ 524.02, at 524–16. And, here, the nondischargeability of any debt under 11 U.S.C. § 523(a)(2), (a)(4) would turn on the merits of the plaintiffs' claims. The merits of such claims are properly resolved in this Court, not in a bankruptcy court. Stovall's motion will be denied.

### 5. *Defendants Duffs, Hecht's and Cortese's claims*

Defendants Duff, Hecht and Cortese seek dismissal of the Complaint as it pertains to them, arguing that they were not partners in Clifford & Warnke during the times relevant to the Complaint. Hecht became a partner on January 1, 1989; Duff became a partner on January 1, 1990; and Cortese was a partner from 1979 to 1981. While Hecht and Duff contend that they became partners after the alleged misconduct, Cortese contends he withdrew before the relevant events.

D.C.Code § 41–112 governs a partner's liability for the wrongful acts of his or her partner(s):

Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

Cortese reads this provision to require that both the act and the injury occur while he was a partner, and Duff and Hecht contend that the Complaint fails to allege loss or injury resulting from misconduct that occurred while they were partners. Their motions will be denied.

 As to Duff and Hecht, the Complaint alleges misconduct by Defendant (and partner) Altman occurring between December 1989 and May 1990. *See* Complaint ¶¶ 88–93. Contrary to their assertion, it is reasonable to infer, at the motion to dismiss stage, that Altman's false statements to the Federal Reserve concealing the illegal acquisition of First American caused injury to the plaintiffs. Under D.C.Code § 41–112, Hecht and Duff may be held jointly and severally liable for the alleged wrongful acts of Altman.

Cortese's argument fails due to similar defects. He was a partner when Clifford and Altman took actions related to the acquisition and control of First American. *See* Complaint ¶¶ 48–58. His reading of § 41–112 to allow a partner to escape liability by fleeing a partnership before the injury manifests itself is rejected. Properly construed, the statute requires only that he be a partner when the wrongful act or omission occurs. While an injury is a prerequisite to recovery, the resulting injury need not have occurred while Cortese was still in the partnership.

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that Clifford and Altman's motion to dismiss is denied; it is

**FURTHER ORDERED** that the Clifford & Warnke partners' motion to dismiss is denied. it is

**FURTHER ORDERED** that Baldwin Tuttle's motion to dismiss is denied; it is

**FURTHER ORDERED** that the motions to dismiss of Brian Yolles, James C. Duff, Philip H. Hecht, and Alfred W. Cortese are denied; and it is

**FURTHER ORDERED** that the motion to dismiss of James T. Stovall, III, is denied.

IT IS SO ORDERED.